Filed 12/21/23  P. v. Montgomery CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANCESCA MONTGOMERY,<br><br>    Defendant and Appellant. | B321606<br><br>(Los Angeles County<br>Super. Ct. No. BA465944) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Francesca Montgomery appeals from her conviction for grand theft by embezzlement from her former employer. The company claimed that appellant, who was responsible for the payroll, issued checks to herself without authorization. At trial, appellant testified that her supervisor had agreed to the payments for overtime and medical insurance reimbursements.

On appeal, appellant argues that the trial court erred in failing to sua sponte instruct the jury with civil jury instructions regarding the legal difference between nonexempt and exempt employees. She contends that whether appellant was classified as an exempt employee, and therefore not entitled to overtime, was a material issue at trial. We find no error and affirm.

## PROCEDURAL HISTORY

In 2019, the Los Angeles County District Attorney filed an information charging appellant with one felony count of grand theft by embezzlement (Pen. Code, §§ 503, 487, subd. (a).)[1] The jury trial began on May 3, 2022. On May 10, 2022, the jury found appellant guilty of the charged offense. The jury also found true the aggravating factor that the crime involved an attempted or actual taking of great monetary value.

The court imposed a suspended sentence and placed appellant on two years formal probation. The court also ordered appellant to perform 300 hours of community labor and to pay restitution to the victim. The court found that appellant had no ability to pay the other court-ordered fines, fees, and costs and therefore stayed them. Appellant timely appealed.

---

[1] All further undesignated statutory references are to the Penal Code.

2

## FACTUAL BACKGROUND

### A.  Prosecution Evidence

#### 1.  Background

The Bakewell Company is run by members of the Bakewell family. The company owns businesses including two newspapers, the Los Angeles Sentinel (the Sentinel) and Los Angeles Watts Times; a radio station; and commercial office buildings.  Danny Bakewell, Sr. is chairman and chief operating officer of the Bakewell Company and publisher of the Sentinel.[2]  Danny Bakewell, Jr. is vice president of the Bakewell Company and executive editor of the Sentinel.  Pamela Bakewell is executive vice president and chief operating officer of the Bakewell Company.  Appellant worked at the Sentinel from 2012 to 2018. During that time, the Sentinel had fewer than 20 employees.

#### 2.  Appellant's employment

Pamela testified that she managed the human resources and accounting departments at the Sentinel.  She hired appellant in 2012 as an accounting clerk.  Appellant reported to the controller, Tracy Mitchell.  Appellant's job was to prepare the checks to be signed for the company's bills.  Pamela testified that appellant was hired as a nonexempt employee.  She explained that nonexempt employees were paid for working overtime, while exempt employees were paid a salary but no overtime.  She stated that she was not aware of any instances in which appellant was asked to work overtime.

Mitchell also testified that appellant started as a nonexempt employee entitled to overtime pay, and that appellant

---

[2]      We refer to members of the Bakewell family by their first names to avoid confusion. No disrespect is intended.

3

filled out daily time sheets.  Mitchell recalled that appellant sometimes worked overtime between 2012 and 2015.  On those occasions, overtime had to be approved by appellant's supervisor and reflected in her time sheet.  Mitchell testified that she was dissatisfied with appellant's work.  Pamela testified that Mitchell told her the same thing and warned Pamela that she should not trust appellant.

When Mitchell left the company in early 2015, Pamela promoted appellant to a "larger role in managing the accounts payable process."  Pamela told appellant she would receive a raise, increasing her salary to $42,000, and would be assuming more responsibility.  Pamela testified that appellant's new position as an account specialist was an exempt position; as a result, appellant was no longer entitled to overtime pay.  Pamela did not recall giving appellant any paperwork to sign in 2015 to reflect the new job and change in status from nonexempt to exempt.  In her new position, appellant managed accounts payable and handled payroll.  Pamela admitted that between 2015 and 2017, appellant processed her own payroll without oversight.

In early 2017, the Bakewells promoted appellant to executive assistant for the chairman, Danny Sr., when his longtime assistant left.  Appellant received another pay raise and became responsible for managing Danny Sr.'s desk.  Appellant told Pamela that although she was assuming new duties, she wanted to continue managing the payroll because she knew how to do it and it did not take much time.  Pamela testified that she agreed because she trusted appellant.  Once again, Pamela did not give appellant any formal paperwork regarding her new job or exempt employment classification.  Pamela testified that after

appellant changed positions in 2015, Pamela never agreed to pay appellant overtime or other payments outside of her salary. Appellant did receive end-of-year bonuses.

Danny Jr. also testified that he never authorized appellant to pay herself overtime after she became an exempt employee in 2015. He read portions of the Sentinel employment manual to the jury regarding employees being classified as exempt or nonexempt, and the policy that overtime work required prior authorization and only nonexempt employees were eligible for overtime pay. Danny Jr. also explained that he had reached an agreement with one employee, Nichelle Holliday, regarding health insurance reimbursement. He had known Holliday and her family for a long time and knew when she started working at the Sentinel that she wanted to keep her existing medical insurance, so he agreed to reimburse her for the monthly cost of the Sentinel's health insurance. Danny Jr. stated that he never agreed to reimburse appellant in this fashion. Pamela also testified that she had never agreed to give appellant medical reimbursement.

In July 2017, Pamela became concerned with appellant's performance after she found bills that either were not paid or were paid to the wrong accounts. Pamela told appellant she thought handling payroll was becoming too burdensome for her and that she would find outside help for that task. Appellant responded that she could handle it and would work harder to correct her mistakes.

On September 8, 2017, appellant lost the phone number for a celebrity who was waiting for a return call from Danny Sr. According to Pamela, appellant became very flustered and said she felt like she was having a stroke. Appellant went to her car

to look for the phone number and never returned to the office. She texted Pamela and Danny Sr. over the weekend that she had gone to the hospital and the doctor told her to stay off work for a week due to stress.

Pamela found that appellant's computer was missing from her office the following Monday. A few days later, appellant's cousin, who also worked at the company, took binders from appellant's office. At that point, Pamela had not been able to reach appellant or secure the return of her computer, so she called the police.

Appellant ultimately agreed to allow Danny Jr. to retrieve the computer from her. Afterward, Pamela saw text messages on the computer from appellant that "indicated that she didn't think very much of us and had a problem with us." Appellant remained on leave until she was formally terminated in early 2018.

Danny Sr. testified that while appellant was working as his executive assistant, it did not appear that she was having any trouble juggling her responsibilities. Appellant would tell him that she loved her job. Danny Sr.'s former executive assistant, Holliday, testified that appellant told her she was stressed about her workload. Holliday also testified that she was an exempt employee while employed at the Sentinel and that she did not receive overtime pay.

### 3.    Investigation

Pamela testified that after appellant left, she hired a consultant, Carlyne Ervin, to handle payroll. Pamela began to suspect that "something wasn't right," and asked Ervin to do an audit of the payroll records related to appellant.

Ervin testified that the Sentinel's internal controls were "very sloppy," with no formal policies or practices and no backup

documentation. She detailed several instances of "sloppy bookkeeping" regarding other employees, where some earnings were improperly coded as regular pay rather than sales commissions.

Ervin discussed the legal requirements necessary to classify an employee as exempt, including a salary threshold and certain job responsibilities. She testified that the Sentinel's policy, as set forth in its employee manual, required nonexempt employees to turn in a time sheet every pay period and receive preauthorization for any overtime. Ervin also explained that an employer cannot legally pay an exempt employee overtime; however, the employer can provide a merit bonus or a merit increase in salary to an exempt employee.

From her review of the Sentinel's records, Ervin determined that appellant was classified as a nonexempt employee until 2015, and then as an exempt employee from 2015 to 2017. Ervin acknowledged that it was the "best practice" to provide documentation to an employee when changing an employment classification; she was not aware of any such documentation for appellant. She confirmed that appellant received raises in 2015 and January 2017.

In her audit, Ervin discovered checks appellant had issued to herself from the Sentinel in addition to her regular salary. Specifically, Ervin found 42 additional payments to appellant from 2015 to 2017, labelled in the payroll system as "regular," but issued in addition to her usual biweekly salary payment. These payments totaled over $23,000. Ervin also found 69 payments to appellant labeled as medical reimbursement during the same time period, totaling over $16,000. Ervin noted that the amounts fluctuated month to month, which would not happen with

7

medical reimbursement of an employee's insurance cost. In total, Ervin found $39,847.60 in additional payments to appellant.

Pamela testified that she was surprised when Ervin told her about the payments to appellant. Pamela stated that appellant never asked her for overtime or additional bonuses during her employment at the Sentinel.

**B.     Defense Evidence**

Appellant testified that she was not told her employment classification when she was hired in 2012. She handled payroll for the Sentinel and also payroll and accounts payable for the company's other newspaper, the L.A. Watts Times. She also assisted with a food festival, Taste of Soul, and did various tasks around the office. After reading the employee manual, she learned about medical reimbursement and thought she was "qualified to receive that." She asked Mitchell in 2014 if she could have the same arrangement regarding medical reimbursement as Holliday, but Mitchell refused the request. However, appellant made the same request to Pamela in 2015 and Pamela agreed.

When Mitchell left in 2015, appellant assumed many of her job responsibilities. At that time, no one explained that her employment status would change to exempt. Starting in 2015, appellant often worked longer than the usual eight-hour workday. When Pamela explained her new duties, appellant asked for additional compensation. According to appellant, Pamela verbally agreed to give her a $10,000 annual salary increase and continue to pay appellant for any overtime work at the overtime rate.

Appellant stated Pamela did not review or approve the payroll before appellant submitted it for processing. Because

8

appellant was not properly trained, she found the work challenging and overwhelming. She expressed her frustration to upper management "all the time."

Appellant testified that she was told she would be taking over the executive assistant position in 2016; no one asked if she wanted the new position. She was not relieved of any of her prior responsibilities, instead, her additional responsibilities included scheduling all of Danny Sr.'s meetings. Appellant did not receive any documentation explaining that she was an exempt employee. Once appellant started working for Danny Sr., he was abrasive, yelled and cursed at her, and behaved "aggressively" when she made a mistake. She worked very long hours, including working every weekend.

Appellant told Danny Sr. and Pamela that she could not handle all of the responsibilities they had given her. On September 8, 2017, she started feeling ill and left work after her doctor told her to go to urgent care. The doctor ordered her to go on bed rest. Appellant stopped to get her computer from her office on her way home from the hospital because she had so much work to do.

According to appellant, she continued to complete time sheets "every single pay period," even after changing to a purportedly exempt position in 2015. Although she processed the payroll, appellant testified that she did not understand what was meant by exempt or nonexempt employees. Instead, appellant stated that she entered employee payroll data based on what she was told about whether that employee did or did not submit timesheets. She acknowledged that she was close friends with Holliday, saw how much she worked, and saw from processing her payroll that Holliday was not paid overtime, other than a

9

"few times." Appellant acknowledged that no one else at the company had the same arrangement regarding a verbal promise to be paid overtime for any work over eight hours. She received a $10,000 raise in 2015, a $4,000 bonus in 2016, and another $5,000 raise when she started training for the executive assistant position.

In a written statement following her interview with the police, appellant stated that as her work increased, "promises of more pay was discussed, overtime was not." She also stated that she "continued to pay myself overtime without discussing it further with my boss." Appellant testified that she did not think she was doing anything wrong and stated that Pamela could check the payroll at any time and see what she was doing. She told the detective that she did not think Pamela would ever check because Pamela was "not that bright."

During cross-examination, appellant acknowledged that as of 2015 she had worked in payroll for five years, first with two prior employers and then with the Sentinel. Each company had exempt and nonexempt employees, and she understood that the difference related to overtime. Appellant testified that she did not believe that she was overpaid and believed that she should have gotten every dollar she was paid. In rebuttal, Pamela denied asking appellant to stay and work particular hours outside of her normal working hours. She also denied any agreement that appellant would receive overtime for any such hours.

Defense expert Kathy Johnson, a forensic accountant, agreed that the Sentinel's policies were sloppy and lacked review protocols. She admitted that she saw neither time sheets for

10

appellant from 2015 to 2017 nor written documentation that appellant was entitled to overtime or medical reimbursement.

## DISCUSSION

Appellant contends that the trial court should have instructed the jury regarding the statutory definitions of exempt and nonexempt employee. Although appellant admits she did not request these instructions at trial, she argues that the court had a sua sponte duty to instruct on the definitions as a general principle of law necessary to the jury's understanding of the case. We find no error.

"'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence'" and "'necessary for the jury's understanding of the case.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 73 (*Brooks*), quoting *People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) "It is also well settled that this duty to instruct extends to defenses 'if it appears ... the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Brooks, supra*, 3 Cal.5th at p. 73, citations omitted.)

Appellant contends the trial court should have instructed the jury that, as a matter of law, she was a nonexempt employee entitled to overtime wages. Alternatively, if there was a question of fact as to her classification, she argues the court should have instructed the jury with CACI 2720 and/or 2721.

CACI 2720 and 2721 are civil jury instructions setting forth an affirmative defense to an employee's claim for nonpayment of overtime wages. CACI 2720 sets forth the requirements for an employer to establish that overtime wages were not required

11

because the employee was an executive employee. CACI 2721 similarly establishes an administrative exemption.

Appellant points out that many of the witnesses at trial discussed the distinctions between exempt and nonexempt employees and testified as to how appellant was classified at the Sentinel. As a result, she argues that whether she was an exempt or nonexempt employee was a "material fact" in dispute at trial and therefore the jury should have been instructed as to the legal distinctions between those classifications. We disagree.

Appellant did not assert as a defense at trial that she was improperly classified as exempt. To the contrary, she testified that she had a verbal agreement with Pamela authorizing her to earn overtime pay regardless of her classification. Appellant also stated that she did not know she had been changed from nonexempt to exempt in 2015 and she had not been properly trained for her job. As such, her counsel argued in closing that appellant did not have the intent to steal required for embezzlement, both because she was relying on the purported verbal agreement and because any incorrect entries in the payroll system were due to ignorance or mistake. Thus, the jury was not required to receive instruction on whether appellant was misclassified as exempt, as appellant did not assert that as a defense.

In any event, as respondent notes, appellant could not have successfully asserted an affirmative defense to criminal embezzlement on the basis that she was entitled to take overtime payments without permission because she had been misclassified.[3] "Embezzlement is the fraudulent

---

[3] Appellant did not file a reply brief on appeal and therefore has not responded to this argument.

misappropriation of property by a person to whom it has been entrusted." (*People v. Creath* (1995) 31 Cal.App.4th 312, 318 (*Creath*).) Section 511 sets forth a claim-of-right defense to embezzlement by establishing that "the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable." However, "this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him." (§ 511.) Thus, this defense "is not established where an employee unilaterally determines that he or she is entitled to certain wages and thereafter, without authorization, appropriates the property of the employer in purported payment of such wages." (*Creath, supra*, 31 Cal.App.4th at p. 318; see also *People v. Proctor* (1959) 169 Cal.App.2d 269, 277 ["[A]ppellant claims the proceeds of the check here in question as an offset against a debt due her for overtime wages. This is not a defense contemplated by section 511."].)

Thus, even if appellant should have been classified as a nonexempt employee, she could not have defended against the charge of embezzlement by claiming that she paid herself the overtime she was owed. Instead, appellant attempted to establish that the overtime payments were authorized by her employer, a contention the prosecution witnesses denied and the jury ultimately rejected. Thus, the instructions regarding employment classifications were neither relevant to the issues raised by the case nor necessary for the jury's understanding.

We also reject appellant's argument that the instruction was required because exempt and nonexempt employees are statutory terms that do "not have a plain, unambiguous meaning," and have a "technical meaning peculiar to the law or

13

an area of law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012 (*Hudson*), quoting *People v. Roberge* (2003) 29 Cal.4th 979, 988.) While those terms have specific meaning under the Labor Code, the jury was not required to understand them, as it was not required to determine whether appellant was properly classified. Thus, appellant's reliance on *Hudson* is misplaced. There, the defendant was charged with evading a pursuing peace officer's vehicle, and the statutory requirement that the pursuing vehicle be "distinctively marked" was an element of the offense. Because the statutory phrase "distinctively marked" carried a "particular legal meaning that differs from its nonlegal meaning," the Supreme Court concluded that instruction on the phrase was required. (*Hudson, supra*, 38 Cal.4th at p. 1013.) Here, by contrast, whether appellant was properly classified was not relevant to the jury's determination of the embezzlement charge.

Thus, we conclude that the trial court was not required to instruct the jury as to the statutory definitions of exempt and nonexempt employee.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



CURREY, P.J.                                                    ZUKIN, J.


14